# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| JOSEPH PALMISANO, JAY HAJESKI, SEAN WALL, WALTER EVERETT, and MATTHEW MANIBUSAN individually and on behalf of all other similarly situated, | Civil Action No. 3:17-cv-9371 (PGS)(TJB) |
| *Plaintiff*, | **MEMORANDUM** |
| v. | |
| CROWDERGULF, LLC, BIL-JIM CONSTRUCTION CO., INC., MAPLE LAKE, INC., R. KREMER AND SON MARINE CONTRACTORS, LLC, ABC CORPORATIONS (1-100), DEF CORPORATIONS (1-500), and JOHN DOES (1-10), et al., | |
| *Defendants*. | |
| BIL-JIM CONSTRUCTION CO., INC., | |
| *Third-Party Plaintiff*, | |
| v. | |
| TOWNSHIP OF BRICK, | |
| *Third-Party Defendants* | |

This case is before the Court on four motions for summary judgment: (1)

Plaintiffs (ECF No. 121); (2) Defendant CrowderGulf, LLC (ECF No. 126); (3)

Defendants BIL-JIM Construction Co., Inc. and Maple Lake, Inc. (collectively

Bil-Jim) (ECF No. 129); and (4) third-party Defendant Township of Brick (Brick)

(ECF No. 132).  All of the motions seek a determination of whether the wages paid

to the named Plaintiffs are subject to the New Jersey Prevailing Wage Act (PWA).

More specifically, the named Plaintiffs are employees of Bil-Jim or a related entity

who allege that they were underpaid because their wages were less than the amount

that should have been paid under the PWA. (N.J.S.A. 34:11-56.25, et. seq.).  The

moving parties agree that the crux of the four motions hinges on whether the PWA

applies to the type of work performed.

## I.

When Hurricane Sandy struck and devastated the New Jersey coastline on or

about October 29, 2012, extensive government relief was required to restore the

coastline communities (recovery services). Hurricane Sandy caused extraordinary

damage throughout the State, especially in coastal areas, including beaches and

waterways.  In order to provide recovery services, government aid was required

from local, state and federal governments.  In this case, the recovery services were

subject to two separate projects – a Municipal Project (Bil-Jim/Brick), and a State

Project (CrowderGulf/DEP).  The terms of the contracts for each project are

discussed separately below.  The only common thread between the State and

Municipal Projects is that Bil-Jim was involved with debris removal on both projects.

Brick/Bil-Jim (Municipal Project)

Prior to Hurricane Sandy, Bil-Jim entered into a three-year "Snow Removal Services" contract with Brick (July 19, 2011). (ECF No. 132-6). Snow removal services are exempt from the PWA. The snow removal services contract was operative in October, 2012 – when Hurricane Sandy struck. On October 29, 2012, Hurricane Sandy devastated Brick and its beaches. In order to provide relief to many municipalities like Brick, then Governor Chris Christie authorized the use of snow removal funds for Hurricane Sandy recovery services. On November 5, 2012, the Governor issued Executive Order 111, which provided that:

> [a] local government unit that has established a snow removal fund pursuant to N.J.S.A. 40A:4-62.1, may, by resolution, utilize existing reserves as necessary to protect the safety, security, health, and welfare of its citizens from the damage caused by Hurricane Sandy . . .

Executive Order No. 111 (Nov. 5, 2012). 44 N.J.R. 2985(a) (Dec. 3, 2012). At that time, Brick and Bil-Jim did not negotiate a new contract for Hurricane Sandy recovery services; instead, the parties agreed to be bound by the terms of the existing snow removal contract. This required Bil-Jim to "prepar[e] for the impending storm," and clear debris from the public rights of way by pushing it to

the sides of the roads using front-end loaders, skid steers, and rubber tire backhoes. (ECF No. 123-2, ¶ 4).

The scope of the recovery work by Bil-Jim was extraordinary. Initially, "clearing the streets" provided access to neighborhoods for emergency vehicles, and subsequently Bil-Jim removed and disposed of the debris. For example, Walter Everett testified that after Hurricane Sandy hit "[w]e cleaned up sand from all the streets and debris from the streets." (ECF No. 123-2, ¶6). According to Mr. Everett, this debris consisted of "[e]verything from basic garbage, house doors, . . . brick, [and] vehicles . . . piece of homes . . . [t]ree limbs . . . and [a]ppliances[.]" (ECF No. 123-2, ¶6). Glenn Campbell, former Director of Public Works for Brick, testified that "[t]here was 525,000 tons of debris that needed to be removed." (ECF No. 123-2, ¶7). Similarly, Andrew Johnson, a foreman and estimator for Bil-Jim, described the municipal project:

> The work initially started with preparation for the impending storm, and then it evolved to rescuing individuals from their residence that were flooded and submerged in water. It then evolved to clearing the public right of way of debris and sand so that the emergency services could access portions of the township and conduct physical searches of homes, structures, for any signs of life or fatalities just to make sure those structures were cleared. And then it continued with debris removal from public property and a screening operation to screen some sand and place the sand back on the

beach. (Johnson Dep.[1], JT.180:17- JT.181:4, ECF No. 122).

Johnson explained that preparing for the storm involved mobilizing and transporting approximately two bulldozers to Brick and demobilizing transporting equipment away from the site.  (JT.181:14 - JT.182:24). At an early stage, Bil-Jim rescued stranded Brick residents with approximately four front loaders carrying people in the bucket. (JT.182:25 - JT.183:13).

According to Johnson, Bil-Jim commenced clearing the roads on or about November 1, 2012 and continued until March or April, 2013.  (JT.184:3-6). Bil-Jim performed road clearance on the mainland and the barrier island.  (JT.187:2-4). On or about November 30, 2012, streets on the mainland were clear to the extent that the debris had been pushed to the side of the road. (JT.187:20-24).  In December, the debris remaining on the side of the road was transported to a staging area where it was sorted. (JT.187:25-JT.118:10).  Roads on the barrier island were also cleared by pushing the debris to the side of the road. (JT.188:18-22). Bil-Jim operated front end loaders, skid steers, rubber tire backhoes, various trucks including dump trucks and pick trucks[2]. (JT.190:8-25).  Debris, not mixed with sand, "went directly – loaded on trucks and directly to the landfill." (JT.196:4-7). If there was debris mixed with a large amount of sand, such debris was loaded and

---

[1] "JT" refers to the deposition of Andrew Johnson.
[2] A pick truck is equipped with a hydraulic arm.  (JT.191:9-12).

transported to a staging area where it was screened to separate the debris from the sand, using a trammel.  (JT.96:15- JT.100:25).  Bil-Jim then transported sand to the beach where it "fill[ed] in any voids or depressions or low-lying areas that the Office of Emergency Management deemed to be a public safety hazard." (JT.196:17-19).

### State Project (CrowderGulf/DEP)

The scope of the State Project covered a much broader area than the Municipal Project, and it principally focused on clearing waterways. Bil-Jim and other companies performed dredging work under the State Project Contract. (ECF No. 126-1, ¶ 51). More specifically, Bil-Jim, or an affiliate (Maple Lake, Inc.), were subcontractors to CrowderGulf (ECF No. 67 ¶18); and Bil-Jim subcontracted some of its work to R. Kremer and Son Marine Contractors, LLC, (Kremer) (ECF No. 67 ¶ 24).   Under its subcontract with CrowderGulf, Bil-Jim removed artificial debris, sand, and other natural debris from waterways (using long-reach excavators), transported the debris to shore, and sifted it with a trammel. (JT.72:8– 19; JT.75:11 – 22; JT.83:1 - JT.84:12; JT.85:21 - JT.86:1; JT.96:12 - JT.97:9). Bil-Jim transported the debris and unusable mud/sand from waterways to landfills or recycling facilities.  (JT.103:18–21; ECF No. 126-1, ¶ 56). Suitable sand was returned to the beach. About thirty (30) percent of the material that Bil-Jim removed was returned to the beach. (JT.105:5 - 10).  Bil-Jim did not construct

dunes or berms with the sand returned to the beach.  (JT. 105:5 - 10)  (ECF No.

126-1, ¶ 59).   Bil-Jim was not paid to grade sand. (LT.74:3 - 14; ECF No. 126-1, ¶

60.

On January 11, 2013, New Jersey's Department of Treasury, Division of

Purchase and Property (DPP), on behalf of the New Jersey Department of

Environmental Protection (DEP), issued a Request for Quotations for Waterway

Debris Removal Services (RFQ). (ECF No. 126-1, Ex. A at 1.)

Prior to the issuance of the RFQ, there were discussions about whether PWA

wages applied to the State Project[3]. Although the RFQ stated that "[i]t is the State's

intent to ensure that all work performed pursuant to this RFQ is eligible for FEMA

Public Assistance grant funding and performed in accordance with FEMA

regulations, policies and guidance," the State PWA is at issue here.  (ECF No. 126-

1, ¶ 6).

Prior to issuing the RFQ, DPP Deputy Director Lisa DuBois consulted

representatives from the Federal Emergency Management Agency (FEMA) on

whether the federal prevailing wage statute would apply to a different contract for

dry debris removal. (See, ECF No. 126-1, ¶7). A FEMA representative responded

---

[3]      The New Jersey Department of Labor had little or no input over the applicability of the
PWA to the State Project.  (See Section III).

that the federal prevailing wage statute is "not applicable to debris removal." (ECF No. 126-1, ¶ 8)(ECF No. 126-4 p. 44)[4].

At another time, DuBois queried FEMA whether the federal prevailing wage statute would apply to a line item requiring construction of a temporary tower to view debris. (ECF No. 126-1, ¶ 9).  A FEMA representative responded:

> The consensus here is that most likely this would be considered construction and therefore [the federal prevailing wage statute] would most likely apply. Has the contractor looked at taking aerial shots or using some other type of service instead of an old, school temp tower? That might get the job done without triggering higher wage rates." (ECF No. 126-1, ¶ 10).

The DPP interpreted this response as "a potential workaround to avoid triggering prevailing wage rates." (ECF No. 126-1, ¶ 11).  As such, the RFQ, "specifically advised bidders that hydraulic scissor lifts would be utilized at [a Temporary Debris Management Area] in lieu constructing a tower." (ECF No. 126-1, ¶ 12). As such, at the time of issuance of the RFQ, the DPP did not consider any of the work to be subject to State or federal prevailing wages. (ECF No. 126-1, ¶ 13).

During the RFQ's question and answer period, CrowderGulf queried the DPP:

---

[4]       Despite this language concerning FEMA regulations, all of the parties contend that the State PWA is at issue, and none of the parties argued that the federal statute applies.  Due to same, the Court only reviewed the State PWA.

Question 1:          "Is this a prevailing wage contract? If so, please provide the
                     wage rates."

DPP Response:        "No, this is not a prevailing wage contract."

On or about January 16, 2022, CrowderGulf submitted a proposal relying

on the above representation. (ECF No. 126-1, ¶¶ 14-16).

On February 21, 2013, the State of New Jersey awarded CrowderGulf the

emergency Waterway Debris Removal Contract for the Central Region of the State

(the "State Project"). (ECF No. 126-1, ¶ 18).

Under a section of the State Project Contract ("Scope of Services"), the type

of work to be undertaken by CrowderGulf included:

> The project consists of removing and disposing or
> recycling of all eligible waterway debris within and
> around the bays and tidal rivers and dredging, pumping,
> screening and redistribution of sand in affected
> waterways of the State of New Jersey. The Contractor
> shall remove Eligible Debris from waterways as directed
> by the State.

(ECF No. 126-1, ¶ 22).  The RFQ defined "Eligible Debris" as "[w]aterway debris

as a result of Superstorm Sandy, . . . inclusive of sand that has been redistributed as

a result of the storm." (ECF No. 126-1, ¶ 23).  More specifically, the State Project

contract designated that sand constituted "Eligible Debris."  (ECF No. 126-1, ¶

24).  The RFQ included a provision regarding the sand:

A. "The Contractor shall remove sand from Hurricane Sandy that would constitute Eligible Debris."

B. Sand that has been determined through analytical testing to be uncontaminated and is otherwise suitable for placement on beaches shall be restored (e.g., screened) by the Contractor to pre-storm beach quality."

(ECF No. 126-1, ¶24).  The RFQ identified eleven zones in which waterway debris removal services were to be performed.   Five of those zones (Zone 3 through Zone 7) are located in the Central Region, which is the region covered within the State Project Contract. (ECF No. 126-1, ¶ 25).

The RFQ further categorized the zones through a priority ranking "in terms of anticipated volume of debris, complexity of debris removal operations, and other factors." (ECF No. 126-4, ¶ 11) Priority A were zones of "the largest volumes of submerged and floating debris;" Priority D were zones of "low/very low levels of submerged and floating debris;" and Priority B and Priority C were zones of moderate to low/moderate levels of debris, respectively. (ECF No. 126-1, ¶ 4, 26).  DEP assessed the central area assigned to CrowderGulf as:

*    Priority A – Zones 4 and 5
*    Priority B – Zone 6
*    Priority C – Zones 3 and 7

(ECF No. 126-1; ¶ 27).   In all five zones in the Central Region, DEP anticipated that the waterway debris removal services would require the removal of submerged and floating debris, including "household contents, structural material, small to

10

medium size pieces of structures, exterior residential contents (patio furniture, grills), docks, vessels, vegetative debris and sand." (ECF No. 126-1, ¶ 28). And, more specifically, the RFQ detailed:

    \*     Zones 4, 5, and 6 – submerged and floating debris and "large size pieces of structures."  (ECF No. 126-1, ¶ 29).

    \*     Zones 4 and 5 – submerged and floating debris including telephone poles. (ECF No. 126-1, ¶ 30).

    \*     Zone 4 – submerged and floating debris including whole structures and vehicles.  (ECF No. 126-1, ¶ 31).

    \*     Zone 4 also included:

> In this area, 58 houses were destroyed in Mantoloking and approximately 45 houses were significantly damaged. Debris from those houses is believed to be in Barnegat Bay, nearby streams and marshes. In addition, 8 vehicles are missing from Mantoloking. Further, breaches of the dunes resulted in deposition of sand from the beach/ocean into Barnegat Bay. The volume of sand deposited in Barnegat Bay in this Zone is unknown, but could be close to 1,000,000 cubic yards.

(ECF No. 126-1, ¶ 32).

Sand was a major part of the scope of services, and the RFQ stated that DEP would issue separate task orders for the sand removal and the depth of such removal in a navigable waterway.  The condition reads:

> The state will issue task orders to the Contractor for sand removal, requiring that the depth of a navigable waterway be restored to a depth of a maximum draft of the largest vessel to traverse the waterway plus 2 feet.

ECF No. 126-4, p. 79-77.  None of the task orders for sand removal were disclosed in the briefing.

On May 13, 2013, The U.S. Army Corps of Engineers issued DEP a permit approving dredging activity in Zone 4. (ECF No. 126-1, ¶ 47).   A special condition of the permit authorized "[o]nly material deposited by Hurricane Sandy (FEMA-eligible material) [was] . . .  necessary to be removed [in order to] access navigation channels, and legally existing docks/piers . . ." (ECF No. 126-1, ¶ 48). Several months later (July 2013), the U.S. Army Corps of Engineers approved dredging in Zone 5. (ECF No. 126-1, ¶ 49).  The permit was limited to "material deposited by Hurricane Sandy (FEMA-eligible material) . . .  to be dredged under this permit." (ECF No. 126-1, ¶50).

Andrew Johnson of Bil-Jim, described Bil-Jim's role in the State Project as:

> "mechanically removing the sand and other debris from the waterway, transporting that to the offload location along the shoreline, loading that material in trucks to be discarded if it was unsuitable, and processing clean sand and returning that to the beach if it was deemed suitable."

(JT.72:11-18, ECF No. 122). Johnson further defined mechanically removing the sand as involving equipment operators who operated excavators sitting on a barge who would excavate sand and other material below the waterline, scoop and place sand on either the excavating barge or on another barge.  (JT.72:22-JT.75:1; JT.83:12-13).

Johnson described the daily activities.  A tugboat pushed the excavating barge onto the shore with the material on it (after the last cast of the day), while during the day other barges were going back and forth between the excavating barge and the shore. (JT.83:13-JT.85:20). The material would be unloaded with a land excavator and then the material was placed in a holding area to dry. (JT. 96:15 - JT. 97:9).  After the drying process, the material would be screened through a trammel and separated into piles with a loader or  bulldozer.  (JT.97:10 – JT. 98:25). If the pile was unsuitable, it would be trucked away to a landfill; and if a pile was suitable, it would be returned to the beach. (JT.99:1 - JT.103:21). Johnson noted the timeline of the work as May, 2013 through December, 2013. (JT.85:1-2).

Reid Loper, project manager for CrowderGulf, describes the State Project as: "performing dredging activities, sand screening, or sediment screening. Wasn't necessarily all sand. Trucking of sand to the tracked beach, and then also trucking . . .  non-beach-quality sand to final disposal location." (Loper Dep[5]., LT.39:23 – LT.40:2, ECF 121-9).  Screening was done with a trammel.  (LT.39:21 - LT.40:14).

Work was performed in Zones 3 through Zone 7. (LT.66:19 - LT.69:6), but Loper noted dredging was performed in Zones 4 and 5, whereas debris removal occurred in all the zones. (LT.67:11-12). Zones 3, 6 and 7 included both visual and

---

[5]      "LT" refers to the deposition transcript of Reid Loper.

submerged debris removal. (LT.67:18-20). Loper testified that removal of visual

debris occurred first, then side scan sonar was used to identify more submerged

debris and that removal process began about a month into the work.  (LT.44:14 –

T.49:9). Dredging was the last activity to occur before wrapping up and dredging

lasted "a couple months" beginning in approximately May or June of 2013.

(LT.49:12-25). Loper characterized the dredging as a mechanical rather than

hydraulic operation. (LT.123:15-20).

Plaintiff Sean Wall who operated an excavator on the State Project explained

similarly: "[T]he sand was extremely high in the channels. So we were in charge of

making the channels able to be navigated by boats and stuff like that . . . the whole

main part of the mission was to free up the waterway for access, for navigation

reasons." (ECF No. 123-22).  Wall explained that sand and debris needed to be

removed as a result of "[the] surge from the storm – the sand surge coming over

the barrier island from Hurricane Sandy." (Wall Dep.[6]

WT. 44:12-25, ECF No. 123-10).

## II.  Legal Standard

A motion for summary judgment should be granted only if "there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law."  Fed. R. Civ. P. 56(a).  "A factual dispute is 'genuine' if the

---

[6] "WT" refers to the deposition transcript of Sean Wall.

'evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Razak v. Uber Techs., Inc.*, 951 F.3d 137, 144, amended, 979 F.3d 192 (3d Cir. 2020) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  "A factual dispute is 'material' if it 'might affect the outcome of the suit under the governing law.'"  *Id*.  "The Court must view the facts and evidence presented on the motion in the light most favorable to the nonmoving party."  *Id*. (quoting *Anderson*, 477 U.S. at 255).  Moreover, summary judgment "is inappropriate when the evidence is susceptible of different interpretations or inferences by the trier of fact."  *Hunt v. Cromartie*, 526 U.S. 541, 553 (1999).

"When the moving party has the burden of proof at trial, that party must show affirmatively the absence of a genuine issue of material fact:  it . . . must show that, on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the non-moving party."  *Wasserman v. Bressman*, 327 F.3d 229, 238 (3d Cir. 2003) (internal quotation marks omitted). Where the moving party bears the burden of proof, the evidence presented in support of summary judgment must be "credible" and "entitled to a directed verdict if not controverted at trial."  *Id*. at 237 (quoting *Celotex*, 477 U.S. at 331 (Brennan, J. dissenting)).  "Once a moving party with the burden of proof makes such an affirmative showing, it is entitled to summary judgment unless the non-

moving party comes forward with probative evidence that would demonstrate the existence of a triable issue of fact." *Id*. at 238.

III.

When enacting the PWA, the legislature delegated authority to DOL to implement the administration of PWA wages on public works. N.J.S.A. 34:11-56.26 and 56.30. DOL has a long history of being the guardians of workers within New Jersey. N.J.S.A. 34:11-56.25 and 56.26(7).  The legislature intended DOL to safeguard workers' wages on public works projects. *Id.*  From a review of the record, DPP/DEP spearheaded the State Project, and with little or no input from DOL, those agencies (DPP/DEP) determined that PWA wages were inapplicable. At some point in 2013, DOL opened an inquiry into the State Project, but no findings were determined. (ECF No. 131-6, Ex. B; ECF No. 131-7, Ex. C). In fact, DOL shrugged its shoulders when the Plaintiffs requested a ruling on the denial of PWA wages by DPP and DEP. Plaintiffs were advised to seek a court order. (Oral Argument Tr., T24:14-24; ECF No. 140).

 In light of this unorthodox administrative process, a fresh look at the issue is warranted.  The PWA establishes a prevailing wage level for workmen engaged in public works in order to safeguard their efficiency and general well-being, and to protect them as well as their employers from the effects of serious and unfair competition resulting from wage levels detrimental to efficiency and well-being.

*Best v. C&M Door Controls, Inc*., 981 A.2d 1267, 1271 (2009).  *See Dep't of Labor v. Titan Constr. Co*., 504 A.2d 7 (1985).  The PWA is remedial in nature and is liberally construed to "effectuate the strong public policy of protecting those whose labor goes into public projects." *Bankston v. Hous. Auth. of City of Newark*, 777 A. 2d 74 (App. Div. 2001).

Under the statute, PWA wages apply to projects that meet the definition of "public work." N.J.S.A. 34:11-56.26(5).  It is defined as:

> construction, reconstruction, demolition, alteration, custom fabrication, duct cleaning, or repair work, or maintenance work, including painting, and decorating, done under contract and paid for in whole or in part out of the funds of a public body, except work performed under a rehabilitation program.
>
> "Public work" shall also mean construction, reconstruction, demolition, alteration, custom fabrication, duct cleaning, or repair work, done on any property or premises, whether or not the work is paid for from public funds, if, at the time of the entering into of the contract the property or premises is owned by the public body or (a) Not less than 55% of the property or premises is leased by a public body, or is subject to an agreement to be subsequently leased by the public body; and (b) The portion of the property or premises that is leased or subject to an agreement to be subsequently leased by the public body measures more than 20,000 square feet.

The prevailing wage rate is determined by the Commissioner of Labor and Workforce Development.  N.J.S.A. 34:11 - 56.30. The PWA requires the public body to specify in the contract the prevailing wage rate for all workers needed to

perform the public work. (N.J.S.A. 34:11 - 56.28).  However, a contractor may be

liable to employees for wage deficiencies "despite the fact that the prevailing wage

rate was not specified in the contract." *Marr v. ABM Carpet Service, Inc*., 286

N.J.Super. 500, 506 (1995). The DOL notes that snow plowing, lawn mowing and

leaf collection are not activities subject to the PWA.  Department of Labor, PUBLIC

WORKS (PREVAILING WAGE) FAQS

https://www.nj.gov/labor/wageandhour/support/faqs/ pwprevailingwagefaqs.shtml.

(last viewed on May 11, 2023).

In short, a project is  "public work" if: (1) it is of a nature described by the

statute (i.e. construction, reconstruction, demolition, alteration, repair work, or

maintenance work) and; (2) either paid for by public funds, or performed on public

property. *Chambers v. Precision Pipeline Sols., LLC*, 2019 WL 3417318, at *3

(D.N.J. July 29, 2019). The work performed on both the State and Municipal

Projects were paid for by public funds and performed on public property. The sole

question that remains is whether the work performed was "of a nature described

by" the PWA.

The briefs submitted rely on the definition of certain types of work referred

to in the definition of public works (such as construction, repair work or

maintenance). The Defendants argue that the Court should apply the definitions of

those words; and if the work does not precisely fit within the definition, then the

PWA does not apply.  For example, the RFQ provided that sand be "redistributed" as part of the services undertaken; and since "redistribution" is different from the words set forth in the statute, the PWA does not apply.  That is, the meaning of "maintenance" or "construction" as used in the PWA is not akin to redistribution. The statute and case law support a broader construction than proffered above. That is, the scope of public work is not simply a rigid definition of the words within that term, but it also captures public work  "of the nature described in the statute." N.J.S.A. § 34:11-56.26(5); *Chambers v. Precision Pipeline Solutions, LLC*, 2019 WL 3417318, at *3 (D.N.J. July 29, 2019).  To illustrate this point, the meaning of certain words within the definition of public works are set forth below, and then those definitions are applied against the "nature" of the work performed on the Municipal and State Projects[7].  The words construction, reconstruction, demolition, alteration, repair work, and maintenance work are found within the definition of "public works."  Each is defined below:

"Construction" is "the act of putting parts together to form a complete integrated object," or "something built or erected." *Construction*, Webster's Third New International Dictionary (1986).

 "Reconstruction" means "the act or process of rebuilding, repairing, or restoring something." *Id*. at *Reconstruction*.

"Demolition" means "the act or process of demolishing or state of being demolished." *Id*. at *Demolition*.

---

[7] This analysis must be undertaken on a case by case basis as the projects differ.

"Alteration" is "a change or modification on a building that does not increase its exterior dimensions." *Id*. at *Alteration*.

"Repair work" refers to work that is performed "to restore by replacing a part or putting together what is torn or broken," or to "fix, mend." *Id*. at *Repair*.

"Maintenance work" means:

> the repair of existing facilities when the size, type, or extent of such facilities is not thereby changed or increased or any work on a maintenance-related project that exceeds the scope of work and capabilities of in-house maintenance personnel, requires the solicitation of bids, and has an aggregate value exceeding $50,000."

N.J.S.A. 34:11-56.26(3). Below, these definitions will be applied against the "nature" of the work performed in the Municipal and State Projects.

*Municipal Project*

The purpose of the Municipal Project was to clear public rights-of-way (roads), which were cluttered with debris. Clearing public roads of debris involved several steps of work.  Under the Municipal Project, Bil-Jim:

1)  Cleared debris from the public right-of-way by pushing the debris to the side of the road.  This provided access for emergency vehicles to enter neighborhoods;

2)  Rescued stranded homeowners with heavy equipment; and

3)  Collected debris from the side of the road and transported suitable sand to the beach and debris to the landfill.

Bil-Jim's work compares to tasks ordinarily performed by municipal

workers like hauling trash, or plowing roads[8]. It does not fit within construction or

"something built or constructed;" or  maintenance as "repair of existing facilities."

In short, the PWA does not apply to the Municipal Project since the work was

more akin to plowing roads or collection of garbage.  Bil-Jim's activities

are not of the nature described within the PWA[9]. As DOL clarified, clearing snow

and collecting leaves are not covered by the PWA. Clearing snow is simply

plowing it to the side of the road. Similarly here, Bil-Jim plowed the debris to the

side of the road.  Bil-Jim also used its heavy equipment to rescue stranded

homeowners from the flood area.  Those activities are not within the nature of

activities described by PWA.  Lastly, transporting the debris to a landfill or the

beach is more like a garbage collector hauling trash to a landfill than it is to

performing construction work.

---

[8]     Often it is argued that a determination of wages subject to PWA should be determined by the terms of the contract rather than by the work performed.  *Chambers v. Precision Pipeline Solutions, LLC*, 2019 WL 3417318, at n.3 (D.N.J. July 29, 2019). Here that analysis does not work because Bil-Jim/Brick relied upon a snow removal contract that is different from the recovery services performed.

[9] Department of Labor, PUBLIC WORKS (PREVAILING WAGE) FAQS https://www.nj.gov/labor/wageandhour/support/faqs/pwprevailingwagefaqs.shtml. (last visited on Jun. 14, 2023).

*State Project*

The major difference between the State and the Municipal Projects is that the State Project involved waterways and included dredging whereas the Municipal Project occurred on land and no dredging was performed.

CrowderGulf's scope of work on the State Project was within Zones 3-7. CrowderGulf subcontracted Bil-Jim to perform collection of debris and dredging work.

Initially, Bil-Jim collected submerged floating debris. This debris included large pieces of structures, telephone poles, vehicles and whole structures.  (ECF No. 126-1, ¶ 31). The collection of submerged and floating debris is arduous work, but it akin to or the nature of collection of garbage -- as an operator picks or lifts it out of the waterway as opposed to construction-related work.

 However, the dredging of sand is different. In the course of the dredging work, Bil-Jim had vessels rigged with long-arm excavators.  As Johnson explained, it was "mechanically removing the sand" involving equipment operators sitting on a barge. (JT 72:22 – JT 75:1).  The excavators then "scooped up" sand and placed it on the vessel.  Subsequently, the sand would be screened in a holding area and transported to either the beach or the landfill.  The scooping or mechanically removing of sand with an excavator to a precise depth to accommodate vessels fits within the nature of public works.  As one would excavate dirt to construct a road,

here, one would excavate sand to maintain or restore a navigable waterway.  As such, the nature of the excavation work or dredging fits within the definition of public work.  Despite the distinction between the collection of debris and dredging, it has not been highlighted in the briefs, and as such, it is not separately considered herein[10].

For example, "repair" means "to restore by replacing a part or putting together what is torn or broken," or to "fix, mend." Webster's Third New International Dictionary (1986) at *Repair*.  Dredging is not "replacing a part or putting together what is torn or broken.  However, as DEP wrote, the waterway is restored  to the depth of the maximum draft of the largest vessel to traverse the waterway plus two feet.  "Restoring" a waterway to that depth is of the "nature" of the work that fits within the definition of a "repair." As Loper stated: "It was to restore the bay to pre-storm depths." (ECF No. 129-8; LT.118:18-21).

Moreover, the dredging activities fit within the meaning of "maintenance." "Dredging" is the removal of sediment and debris from the bottom of . . .  water bodies[11] and "deepens [a waterway] with a machine that removes earth . . ." [12].  For certain, the scooping and excavating of sand to the depth prescribed by DEP fits

---

[10]   If the parties can distinguish the dredging through DEP task orders and the permits issued by the Army Corps, the Court would reconsider the issue.

[11] National Oceanic and Atmospheric Administration, What is Dredging. https://oceanservice.noaa.gov/facts/dredging.html (last visited May 23, 2023).

[12]   Merriam-Websters Dictionary, Dredge, https://www.merriam-webster.com/dictionary/dredge (last visited May 23, 2023).

within the nature of maintenance work.  That is, the existing facilities (waterways) do not change, but the dredging is a repair that exceeds a statutory cost, and is beyond the capabilities of in-house maintenance personnel.  Although the Defendants' claim the dredging of sand was a "redistribution" or "leveling" of sand to is prior depth, the argument fails because the nature of the work (excavating and scooping of sand from a waterway) fits within the words maintenance and repair under public works.

IV.

As noted earlier, there are four motions, and each is resolved based on the above rationale.   Below each motion is determined.

(A)    the Plaintiff's motion asks "whether Plaintiffs' work fits within the definition of public work under the [PWA]"  There were five Plaintiffs named and their work is described below.

Joseph Palmisano

 R. Kremer Marine Contractors, LLC (Kremer) employed Plaintiff Joseph Palmisano on the State Project as a Tug Boat Operator, Operating Engineer, Tug Captain, Tug Master, Power Boat Captain, and/or Deck Hand or General Laborer between March 2013 until in or about September 2013. (ECF No. 1 at ¶30).

Palmisano's work is subject to PWA wages on the State Project for the following reason:   Palmisano worked for Kremer who is a subcontractor of Bil-

Jim; and Palmisano operated a tugboat that was necessary equipment to dredge and excavate the sand. In addition, his employment occurred within the time period of the State Project.

Jay Hajeski

Kremer also employed Jay Hajeski on the State Project, as a Tug Boat Operator, Operating Engineer, Tug Captain, Tug Master, Power Boat Captain, and/or Deck Hand or General Laborer from approximately May 2013 until September 2013. (ECF No. 1 at ¶31). Hajeski's work is subject to PWA wages on the State Project for the same reasons as Palmisano.

Sean Wall

Bil-Jim employed Plaintiff Sean Wall on both the Municipal and the State Projects, as a machine operator or "Operating Engineer" between December 2012 until March 2013. (ECF No. 1 at ¶32).

The Court cannot determine from the facts submitted in support of summary judgment whether Wall worked for Bil-Jim on both the Municipal and State Projects. Walls' time period of employment was from December 2012 – March 2013, comports with the timeframe of the Municipal Project. As such, the PWA is inapplicable.  There are insufficient facts to determine the timeframe for his work on the State Project, or what his job responsibilities were.

Matthew Manibusan

According to Plaintiff, Bil-Jim employed Matthew Manibusan on both the Municipal and State Projects, as an "Operating Engineer;" but at another time, it is alleged that Manibusan limited his work to the Municipal project from December 2012 to May 2013.(ECF No. 67 at ¶41).  (ECF No. 110-8 p. 17).  Since the Municipal Project does not fall within the definition of public work, the PWA does not apply to Matthew Manibusan.  There are insufficient facts to determine whether Manibusan's employment included the State Project.  As such, summary judgment is denied as to Matthew Manibusan.

Walter Everett

Plaintiff Walter Everett alleges he was employed by Bil-Jim on both the Municipal and the State Projects, as a mechanic, lead engineer, foreman, and/or "Field Engineer", from approximately November 2012 until March 2013. (ECF No. 1 at ¶33). Specifically, Everett testified he repaired equipment for Bil-Jim and he served as a supervisor/foreman overseeing the dredging of the bay for the State Project. (Everett Dep., ET.41:16 - ET. 42:7; ET.77:17-ET.78:6; ET.79:7-11, ECF No. 125-3).

On the other hand, Bil-Jim argues that Everett was retained as an independent contractor. Bil-Jim claims: Everett was an independent contractor and he used his own equipment.  He received an IRS Form 1099 rather than a W-2

form for tax reporting purposes.  Since supervisors and mechanics performing off-site equipment repairs are not covered under the PWA, Everett is not subject to PWA wages.

Since there are so many fact issues, Everett's work must be addressed at an evidentiary hearing (if necessary).  As such, summary judgment is denied as to Walter Everett.

(B)    CrowderGulf's motion for summary judgment is denied on the grounds set forth above concerning the State Project.  The breadth of this decision is limited and concerns only the facts set forth in the Statement of Undisputed Facts concerning Central Zones 3 – 7, and Bil-Jim's involvement with CrowderGulf.

(C)    Bil-Jim's motion for summary judgment argued that "emergency" debris removal is non-PWA work. Although Bil-Jim's brief fails to cite to any caselaw supporting an exemption for emergency work, its motion for summary judgment is decided on other grounds.  Summary judgment is granted on the Municipal Project, and denied on the State Project for the reasons stated herein.

(D)    Brick's motion for summary judgment on the grounds that the PWA does not apply to the Municipal Project is granted.

An appropriate order will follow.

June 16, 2023                        s/*Peter G. Sheridan*
                                     PETER G. SHERIDAN, U.S.D.J.

27